Log Cabin Mines Company, a Corporation v. Commisioner.
Log Cabin Mines Co. v. Commisioner
Docket No. 1303.
United States Tax Court
1945 Tax Ct. Memo LEXIS 2; 4 T.C.M. (CCH) 1124; December 29, 1945
*2 David E. Hinckle, Esq., 411 W. 7th St., Los Angeles, Calif., for the petitioner. Byron M. Coon, Esq., for the respondent. ARNOLD Memorandum Findings of Fact and Opinion ARNOLD, Judge: Petitioner, in its amended petition, challenges respondent's determination of deficiencies in income tax for the calendar years 1940 and 1941 in the respective amounts of $1,181.16 and $323.86 on the ground that the deficiencies resulted from a method of computing depletion which is erroneous in that it allows depletion only to the extent of about one-third of petitioner's investment in certain gold mining claims. The issue was submitted on the pleadings and documentary evidence. Findings of Fact Petitioner is a corporation organized and existing under the laws of the State of California. During 1939, 1940 and 1941 petitioner operated a gold mine and a mill in Mono County, California. Petitioner's returns of income and excess profits tax for the years 1939, 1940 and 1941 were filed with the collector of internal revenue at Los Angeles, California. On July 13, 1932, Alice Clark Ryan, Mary N. Clark, and Chandis Securities Company, a California corporation, owners of certain gold *3 lode mining claims in Mono County, California, designated as sellers, entered into a contract with Russell F. Collins and Ben L. Collins, brothers, designated as buyers, under which the Collins brothers were to enter upon and work the claims continuously and in good workmanlike manner in accordance with the terms of the agreement. Under the contract after the mine was put on production $5.00 per ton was to be allowed the buyers to recover the cost of mining, milling and marketing and the sellers were to receive the balance over that amount, any amounts so paid to the sellers applying upon the purchase price of the property until it was paid in full. The buyers had the right to purchase the property for the sum of $150,000 payable in 10 installments of $1,000 each with the balance of $140,000 payable five years from the date of the contract. All amounts paid by the buyers were to be credited upon the installments of the purchase price as they matured and if such payments amounted to the full purchase price prior to expiration of the contract, or upon full payment according to the terms, the sellers were to convey all their right, title and interest to the buyers. In case of default *4 by the buyers the sellers could terminate the contract. The contract was assigned to Mutual Gold Corporation, a corporation organized by the buyers and others under the laws of the State of Washington. Certain modifications of the contract were made in subsequent years with reference to the manner of operations. Under an amendment made in October 1936 the sellers allowed Mutual Gold $8.00 per ton to pay expenses of mining and milling the ore extracted from certain parts of the claims, and all receipts in excess of that amount were to apply upon the purchase price. This amendment further provided that should these payments not amount to $10,000 before November 1, 1937, or for each of the years ending November 1, 1938, November 1, 1939, and November 1, 1940, Mutual Gold would make up any such deficit so that the sellers would receive the minimum of $10,000 in each such year, and that the remainder of the purchase price was to be payable on or before November 1, 1941. On September 2, 1938, Mutual Gold entered into an agreement with Frank A. Garbutt, of Los Angeles, California, which contemplated that he would cause a corporation to be formed to take over and operate the properties *5 and that he would furnish certain funds for further development of the claims. Pursuant to this agreement, petitioner was organized in 1938 and entered into a contract on December 17, 1938 with Garbutt and Mutual Gold. On March 10, 1939, the 1932 contract together with all modifications and agreements supplemental thereto, was assigned to petitioner with the consent of all parties in interest. Petitioner succeeded to the possession of the properties as of April 1, 1939. At that time $30,000 had already been paid on the purchase price and a certain amount of the ore had been extracted. Garbutt advanced money to petitioner which was used in developing the mining property. One hundred seventy-seven thousand tons of ore remained in place in the mining claims at the time petitioner took possession. Petitioner mined from the claims, and milled and sold the gold derived from, 12,777 tons of ore in 1939, 35,652 tons in 1940, and 19,919 tons in 1941. Petitioner paid the sellers on the purchase price of the claims the sums of $10,000 in 1939, $13,500 in 1940, and $6,500 in 1941. In consideration of the assignment to petitioner of the 1932 contract, petitioner paid outstanding indebtedness *6 of Mutual Gold in the sum of $3,928.57 in 1939. In its income and excess profits tax returns filed for the years 1939, 1940 and 1941, the petitioner reported net losses after deductions for depletion, as shown below: Net (Loss)
Depletion
Year
Reported
Deducted
1939
($ 950.29)
None
1940
( 34,134.80)
$35,409.57
1941
( 48,133.29)
19,783.55
In its 1940 return the petitioner took a deduction of $13,640.40 for a 1939 operating net loss. The excess of that amount over the net loss of $950.29 shown on the 1939 return represents depletion claimed for that year, after the filing of the return. In Form "D" submitted with its 1940 return the petitioner stated the cost of the property operated by it under contract, for depletion purposes, at $175,797.57 and estimated available ore reserves of 177,000 tons at the time it took over the contract, reflecting a unit rate of approximately $0.9932 per ton, the rate used in computing the depletion deductions taken for the years 1939, 1940 and 1941. The cost figure so reported was made up as follows: Cash payment
$ 10,000.00
"Contract of Purchase acquired"
110,000.00
Mutual Gold Corporation
Liabilities: Production notes
31,807.00
Accounts Payable Nov. 1, 1938
20,062.00
Outstanding Liabilities in ex-
cess of assets April 1, 1939
3,928.57
$175,797.57
*7 Under date of May 22, 1942, an engineer revenue agent submitted a valuation report in which the estimated ore reserves were accepted, as stated by the petitioner in Form "D," at 177,000 tons, but the petitioner's cost basis for the purpose of computing allowable depletion for the years 1939, 1940 and 1941 was found to be as follows: Payments
April 1, 1939
$10,000.00
March 28, 1940 to December 4,
1940
13,500.00
June 30, 1941 to September 18, 1941
6,500.00
Liabilities of predecessor assumed
as of April 1, 1939
3,928.57
Total
$33,928.57
On the above basis the engineer revenue agent computed allowable depletion as follows: 1939
1940
1941
Ore Reserves (tons)
177,000
164,223
128,571
Cost to end of year
$13,928.57
$26,423.02
$27,186.61
Depletion rate per ton
$ .0787
$ .1609
$ .2115
Production (tons)
12,777
35,652
19,919
Depletion allowable
$ 1,005.55
$ 5,736.41
$ 4,212.87
Depletion claimed by petitioner
$12,690.11
$35,409.57
$19,783.55
Depletion computed by revenue agent
1,005.55
5,736.41
4,212.87
Difference
$11,684.56
$29,673.16
$15,570.68
Respondent's determination was based upon the engineer revenue *8 agent's report. The depletion adjustments shown above, together with unprotested adjustments made by the revenue agent, had the following effect on claimed operating net loss deductions for 1939 and 1940: 1939
1940
Operation net (loss)
claimed
($13,640.40)
($34,134.80)
Depletion disallowed
11,684.56
41,357.72
($ 1,955.84)
$ 7,222.92
Capital Stock Tax: Not deducted
($ 400.00)
($ 400.00)
Overstated
180.00
Refund on electric
bills
655.60
Net (loss) or income as
adjusted
($ 2,355.84)
$ 7,658.52
Petitioner had an economic interest in the minerals in place. Opinion The question for solution is whether petitioner's economic interest in the minerals extended in part to the ore in place in the mining claims, as determined by respondent, or was limited to the ore severed, as contended by petitioner. The parties agree that petitioner had an economic interest in the minerals to some extent and that depletion is allowable in some amount. There is no dispute as to the amount of the ore reserve, the amounts of ore removed each year, or the amounts paid by petitioner on the contract. The petitioner did not elect to take percentage depletion *9 and hence only cost depletion is involved. Petitioner contends that the depletion allowed under respondent's computation is not a reasonable allowance, as provided by section 23(m) of the Internal Revenue Code; [1] that the law contemplates a taxfree return of all, or substantially all, the capital consumed in the production of gross income through severance of minerals in place, whereas the respondent's computation allows a tax-free return of only 32 percent of the petitioner's capital investment. In form the 1932 contract was an agreement of sale, the sellers agreeing to sell certain described mining claims, with the right of possession and the right to mine and develop, subject to certain limitations. The buyers agreed to perform certain services. The buyers had the right *10 to complete the purchase by payment of the purchase price, but were not obligated to do so. At the time petitioner took over the contract, $30,000 had been paid on the full purchase price of $150,000. Whatever economic interest petitioner's predecessors had by reason of the payment of this sum passed to petitioner upon assignment of the contract. In consideration of the assignment petitioner paid $3,928.51 on account of debts of Mutual Gold. Petitioner made further payments to the sellers on the purchase price amounting to $30,000. According to respondent's computation, petitioner had invested $33,928.57 in the project and was entitled to depletion in the amount of $10,954.83, leaving an unrecovered cost of $22,973.74 at the end of 1941. The acquisition of its predecessor's rights by the assignment of the contract and the payments made by petitioner to the sellers did more than secure a license to continue the extraction and milling of ore. Payments to the sellers applied upon the purchase price of the entire mineral content under the contract, and therefore amounted to an investment in all the minerals. If petitioner saw fit to abandon the venture rather than exercise its option *11 to buy, it none the less had, up to the time of abandonment, certain rights and interests in the whole property. If the contract and payments thereunder gave petitioner a depletable interest to any extent, and both parties agree that it did, it extended to the ore in place as well as to the ore severed. Petitioner's method of computation would entitle it to 100 percent depletion until its entire cost is recovered. The law does not permit a taxpayer to expense the payments like rent where a depletable interest is involved. A claim for recovery of cost out of the first receipts was rejected in Commissioner v. I. A. O'Shaughnessy, Inc., 124 Fed. (2d) 33. In that case it is stated that the Congressional purpose is to allow return of capital through statutory depletion from the date of the acquisition of the depletable interest so long as gross income is realized dependent upon production. Regulations 103, section 19.23(m)-2, [2] dealing with cost depletion of metal mines, provides that the depletion for any year shall be computed by dividing the basis applicable to the mineral deposit by the number of units of mineral remaining as of the taxable year, and by multiplying the *12 depletion unit, so determined, by the number of units of mineral sold within the taxable year. Similar provisions appear in Art. 23(m)-2 of Regulations 101, 94, and 86; and Art. 222 of Regulations 77 (1932).the number of units of mineral remaining as of the taxable year is defined as the number remaining at the end of the year to be recovered from the property plus the number sold within the year. This is the method of computation used by the respondent in this case. The regulations do not authorize the method of computation proposed by the petitioner. This provision of the regulations has been in effect for many years and must be deemed to have Congressional approval by reenactment of the statutory provision and to have the force and effect of law. Helvering v. R. J. Reynolds Tobacco Co., 306 U.S. 110. *13 The respondent's computation was made in accord with the applicable law and regulations. The burden of establishing that respondent's computation is erroneous is upon the petitioner. Reinecke v. Spalding, 280 U.S. 227. We are of the opinion that this burden has not been met and that respondent's determination as to depletion should be sustained. In its brief petitioner seeks to require respondent, if sustained upon the issue of depletion, to recompute the income for 1941 by allowing a carryback loss from 1942 and 1943. This point was not raised in the petition or amended petition and no evidence concerning it was presented. Hence, it will be disregarded. H. D. & J. K. Crosswell, Inc., 6 B.T.A. 1315. Decision will be entered for the respondent. Footnotes
1. Sec. 23 (m)↩ DEPLETION. - In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary.
2. Sec. 19.23 (m)-2. COMPUTATION OF DEPLETION OF MINES, OIL AND GAS WELLS, AND OTHER NATURAL DEPOSITS WITHOUT REFERENCE TO DISCOVERY VALUE OR PERCENTAGE DEPLETION. - The basis upon which depletion, other than discovery depletion or percentage depletion, is to be allowed in respect of any property is the basis provided in section 113(a), adjusted as provided in section 113(b) for the purpose of determining the gain upon the sale or other disposition of such property. (See sections 19.113(a)-1 to 19.114-1, inclusive). If the amount of the basis as adjusted applicable to the mineral deposit has been determined for the taxable year, the depletion for that year shall be computed by dividing that amount by the number of units of mineral remaining as of the taxable year, and by multiplying the depletion unit, so determined, by the number of units of minerals sold within the taxable year. * * * * *
"The number of units of mineral remaining as of the taxable year" is the number of units of mineral remaining at the end of the year to be recovered from the property (including units recovered but not sold) plus the "number of units sold within the taxable year" as defined in this section.↩